Filed 4/30/14  P. v. Cook CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B248133 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA25327) |
| v. | |
| ANDREW TYRONE COOK, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  John T. Doyle, Judge.  Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Eric E. Reynolds and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Andrew Tyrone Cook (defendant) appeals from his gang related robbery conviction. He contends that the trial court erred in precluding cross-examination of the investigating officer/gang expert as to an unrelated shooting and resulting civil action in which the officer was involved. Defendant also contends that substantial evidence did not support the finding that the crime was gang related, and that the imposition of a $280 restitution fine was an ex post facto violation. Defendant has failed to preserve the ex post facto issue, and we decline to reach the merits. Finding no merit to defendant's remaining contentions, we affirm the judgment.

## BACKGROUND

**Procedural history**

Defendant was charged with two counts of second degree robbery in violation of Penal Code section 211.[1] The information alleged that count 1 had been committed for the benefit of, at the direction of, and in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members, within the meaning of section 186.22, subdivision (b)(1)(C). As to count 2, the information alleged that defendant personally used a firearm in the commission of the offense, within the meaning of section 12022.53, subdivision (b). It was further alleged pursuant to section 667, subdivision (a)(1), as well as for purposes of the "Three Strikes" law (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)), that defendant had suffered a prior serious felony conviction. The information also alleged three prior convictions for which defendant had served prison terms within the meaning of section 667.5, subdivision (b).

A jury convicted defendant of count 1 as charged and found the gang allegation to be true. After the jury deadlocked on count 2, the trial court declared a mistrial, and on motion of the prosecutor, dismissed the count. In a bifurcated proceeding, defendant waived his right to a trial on the prior convictions and admitted he suffered a prior robbery conviction that qualified as a strike, as well as two other convictions with prison terms. On April 9, 2013, after denying defendant's motion for new trial, the trial court

---

[1]     All further statutory references are to the Penal Code, unless otherwise indicated.

sentenced defendant to 23 years in prison. The court selected the middle term of three years, doubled as a second strike, added five years pursuant to section 667, subdivision (a), plus 10 years due to the gang finding, and two one-year enhancements due to prior prison terms. Defendant was awarded 608 actual days of presentence custody credit, plus 91 days of conduct credit for a total of 699 days. The trial court ordered defendant to pay a $280 restitution fine, as well as other mandatory fines and fees, and to provide a DNA sample.

Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

### Mesinas robbery (count 2)

On August 7, 2011, at approximately 6:00 a.m., as Noe Mesinas (Mesinas) was walking home from the train station on Imperial Highway near Grape Street, he was robbed at gunpoint of cash and other items by two African-American men. The men were approximately 25 to 30 years old; one was a bit taller than five feet five inches tall, and the other was taller than that. Although the taller man pulled Mesinas's T-shirt over his head so that it covered most of his face, Mesinas was able to get a look at him. A few months later, Mesinas selected defendant's photograph from a six-pack photographic lineup, and identified him as the taller robber who had pulled his T-shirt and put a gun to his back.

### Villavicencio robbery (count 1)

Four days later, on August 11, 2011, Gabriela Villavicencio (Villavicencio) was walking on Imperial Highway toward the same train station sometime between 6:30 and 6:45 a.m., when she saw two African-American men. The taller of the two men, who was wearing a black bubble jacket, gave a signal to the shorter one, and then grabbed Villavicencio's purse. When Villavicencio screamed and hit the shorter man with her plastic lunchbox, he took the lunchbox from her and caught up with the other man at the corner. Villavicencio then saw both of them run onto Grape Street and disappear into an alley.

Los Angeles Police (LAPD) Officer Jesse Pineda interviewed Villavicencio and another witness at the crime scene. He then communicated the suspects' descriptions to Officer Jose Carias with the information that the suspects had fled into the nearby Imperial Courts housing project (Imperial Courts project or the projects). Officer Carias both reviewed time-stamped video recorded earlier by surveillance cameras in the projects and in the area of Imperial Highway and Grape Street, and watched surveillance images in real time. He observed two men walking westbound on 115th Street to Grape Street toward Imperial Highway at 6:32 a.m., wearing clothes matching the descriptions he was given. Officer Carias recognized one of the men as Derek Martin (Martin), whom he knew from prior contacts. The same two men, wearing the same clothing, could be seen at 6:45 a.m. running north on Grape Street then east on a walkway leading into the projects.

Beginning about 8:30 or 9:00 a.m., Officer Carias watched the live feed from the cameras in the projects. He could see the entire housing development and was able to focus on Martin's former apartment unit. There he saw a person with a build and clothing similar to that of Martin's companion seen earlier that morning. Officer Carias, who controlled the movement of the cameras, tracked the man as he walked within the projects. When the man picked up a black jacket from some bushes near the northeast corner of Grape Street and 115th Street, Officer Carias told Officer Pineda to detain him.

Defendant was the man Officer Pineda detained. He was taken to the police station where Villavicencio identified him in a field show-up as one of the two robbers. Villavicencio recognized defendant's face, the black jacket, and his hair style -- lots of little pony tails. A few days later, Villavicencio was taken to another field show-up and identified Martin as the other robber. Villavicencio then identified defendant in court as one of the two men who robbed her, the one wearing the black jacket which was in evidence. Villavicencio identified a photograph of Martin as the shorter man involved in the robbery.

Officer Carias testified as the prosecution's expert on the PJ Watts Crip gang (PJ Watts) and gang culture in general. He testified that PJ Watts was an active criminal

4

gang and its primary activities were robberies, burglaries, home invasions, narcotics sales, shootings, and murder. The gang's territory included the Imperial Courts project, the area near Imperial Highway and Grape Street, and 115th Street. Officer Carias presented evidence showing offenses by those he knew to be members of the PJ Watts gang: Deandre Fountain who was convicted in 2009 of possession of a firearm by a felon, and Robert M. Barnes, who was convicted of the same offense in 2009.

Officer Carias described the PJ Watts gang's common signs and symbols, including hand signs, tattoos, and clothing. Tattoos were typically P and J which stood for the projects; PJWC for Projects Watts Crips, or street names or numbers within the gang's territory, such as 115 for 115th Street, and images of bricks, signifying the projects, as it was built of bricks. Members also might have tattoos indicating a clique or subset of the gang, or a squad. Officer Carias took photographs of defendant, showing a tattoo of 115 and "Squad Alumni" over an image of bricks on his abdomen, and tattoos of a P and a J on his left thigh. Martin's tattoos included a P and J on either side of his face, a P and J on his neck, and bricks on his forearm.

Officer Carias testified he was acquainted with Martin and had documented him beginning in 2008. It was Officer Carias's opinion that Martin was a PJ Watts gang member whose gang moniker was "Roscoe." This opinion was based on Martin's admissions to him, his contacts with Martin in and around the projects, and Martin's tattoos. It was also Officer Carias's opinion that defendant was a member of the PJ Watts gang and his moniker was "Half Dead" or "HD." He based this opinion on evidence of defendant's commission of the robbery with Martin in PJ Watts territory, defendant's tattoos, and a conversation with defendant's girlfriend the day before his testimony in which she told Officer Carias that she had been in a relationship with defendant for nine years and knew him to be a member of PJ Watts. Defendant's girlfriend also identified her tattoos to Officer Carias, including "Half Dead" behind her ears which she said was for defendant.

Officer Carias was familiar with every gang in his division and explained that a gang's reputation for violent crimes committed in the community served to frighten

5

people and thus to discourage them from cooperating with law enforcement. A gang member gained the respect of his peers by "putting in work" for the gang, which meant committing violent acts and crimes to enhance the gang's reputation. Putting in work could also mean assisting and supporting a fellow gang member while committing a crime, or providing a witness to prove that the work was completed. Typically most such crimes occur in the gang's own territory, which among other reasons, served to increase fear in the community and make witnesses more reluctant to come forward.

When given a hypothetical question mirroring the facts of the Villavicencio robbery, Officer Carias gave his opinion that the crime was committed for the benefit of and in association with a criminal street gang. His opinion that such a crime would benefit the gang was based on the following facts: the crime was committed in broad daylight in the hub of the gang's territory by a documented gang member with gang related tattoos and another person who, while not documented, had tattoos consistent with membership in the gang. Such circumstances would cause fear and intimidation within the community and thus allow the gang to continue to commit crimes and pursue its criminal enterprise without police interference. Although the money or items stolen in a robbery would not necessarily benefit the gang, the robbery itself would do so by enhancing the gang's violent reputation.

**Defense evidence**

LAPD Officer Juan Ponce testified that he and his partner interviewed Mesinas at the crime scene, where Mesinas told him that both robbers on August 7, 2011, were five feet nine inches tall and weighed 160 pounds.

Defense investigator Gary Cooper (Cooper) testified that he interviewed Mesinas, who described one of the robbers as taller than six feet, 220 pounds, and wearing a black hoodie with the hood up. Mesinas also said that when one of the robbers pulled up his shirt he could only look downward and was therefore only 80 percent certain of his identification of defendant's photograph. Mesinas also told Cooper that he did not see anyone he could identify as either robber when he went to court for pretrial proceedings.

6

In May 2012, after Martin pled guilty to the Villavicencio robbery, Cooper interviewed him. Martin said that defendant was not involved in that robbery, that Martin committed it with a man named "J Coll," whom he described as a Black male in his 20's, five feet ten inches tall, weighing 160 pounds.

Martin testified on defendant's behalf. He admitted being an active member of PJ Watts which was headquartered in the Imperial Courts project. He had been a member of the gang since 1996 or 1997 and had various tattoos indicating his membership in the gang. He wore a P and J on his face so that people would know he was a member of the PJ Watts. He also had a P and J on his neck and bricks on his arm to represent the projects. Martin admitted that he remained a PJ Watts member while in prison and "always."

Martin claimed that defendant was not involved in the robbery, that he did not know defendant at that time, and that he did not meet defendant until the first court date in this case. Martin testified he knew every active member of his gang who frequented the projects and claimed, "If you ain't there every day and you ain't active, I don't know you," and "I know [defendant] ain't from my hood. I ain't never seen him before for sure." When the prosecutor showed Martin the photographs of defendant's tattoos, he claimed that a member of PJ Watts would not get "115" tattooed on him, explaining that 115 was not a clique of PJ Watts and that although the robbery was committed at 115th and Grape Streets, 115th Street was not part of his hood.

Martin testified that on August 11, 2011, he left the projects around 6:45 a.m. to go to the nearby train station, where "Red," a member of a different gang, introduced him to J Coll, short for "J Corleone," which was a "hood name." Red said that J Coll was a young PJ Watts member who "claimed the hood," and Martin replied that J Coll would have to come to the hood to get officially "jumped in" to the gang. Martin also testified that J Coll had already been jumped in, and that he had personally taken J Coll to his hood for that purpose. Martin did not make clear when that happened, as he claimed they first met when introduced by Red at the train station. He added that he never saw J Coll again after the robbery. Martin claimed that Red was dead by the time of trial and

7

acknowledged that he had never before spoken Red's name in connection with his version of the robbery.

Martin claimed he committed the robbery for his personal benefit, not the gang's, because he needed some money to get high. Martin knew that since J Coll was a new member, he would have to prove himself by going on "missions." Thus Martin instructed J Coll to stand watch at the corner. The robbery happened very fast: Martin took off and J Coll ran behind him, but when Martin looked back, J Coll was gone, and Martin never saw him again. Martin described J Coll as about five feet seven to ten inches tall, weighing 165 pounds, with a little "fro" hairstyle, and wore a black hoodie during the robbery. When asked to identify defendant in court, Martin testified that he was not J Coll. After the prosecutor showed Martin the surveillance video of him and the other suspect, Martin acknowledged that J Corleone had the same height and build as defendant.

Martin acknowledged he lied when he was first arrested by claiming that he had done nothing. He told the police, "That's on PJ's." At trial he explained, "I put that on the hood. That's how we talk." After he was shown the surveillance video showing him running through the alley he decided to take a plea bargain and he pled to the charge in April 2012. Martin claimed that when he entered his plea, he told his attorney that defendant had nothing to do with the robbery and that he said it in open court to the deputy district attorney who took his plea.

Martin testified that in May 2012, after his plea, he told Cooper that defendant had not been with him, and that he did not even know defendant then. Martin gave Cooper a description of J Coll. In October 2012 Martin told Officer Carias that defendant was not involved, rather it was J Coll. He gave a description of J Coll and said "he was hanging at" the shopping center or the train station, but claimed that no one in the projects knew J Coll except the four or five unnamed people who "courted him on." Martin thought Officer Carias doubted him, as there was no follow up. Martin was not shown photographs in an effort to identify J Coll.

8

Martin was not forthcoming with Officer Carias because he did not like the officer. Martin explained, "I didn't want to see his face because he killed a homie . . . and he be harassing us." Martin denied that he spelled out "J. Cole" instead of "J Coll" but after the prosecutor played a recording of the interview in which he spelled "J-C-O-L-E," Martin explained that he was high during the interview. Martin then denied being high and claimed he spelled it that way because of Keisha Cole. Finally, Martin again claimed that he was high during the interview.

**Rebuttal**

Deputy district attorney Tracey Stevens testified that she took Martin's change of plea on April 26, 2012, and that he never mentioned the name J Coll to her or said anything to her regarding the involvement of a person named J Coll in the robbery.

Officer Carias testified that he unsuccessfully attempted to locate J Coll using the spelling Martin gave him and variations of the name by searching department resources and asking Detectives Moreno and Peters to search for a person with that name associated with Imperial Courts or the PJ Watts gang. After Martin said J Coll had been courted or jumped into the gang at the train station, Officer Carias searched the surveillance video for some indication that a person was jumped in or courted, but he found nothing.

## DISCUSSION

### I. Limitation on cross-examination

Defendant contends that the trial court abused its discretion in limiting the cross-examination of Officer Carias under the authority of Evidence Code section 352 and by denying his motion for new trial based upon the limitation. Defendant also contends that the trial court's rulings resulted in a denial of his constitutional rights to due process, confrontation, and to present a complete defense.

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) The trial court's discretion under Evidence Code section 352 will not be disturbed unless it was exercised "'in an arbitrary,

9

capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.) Similarly, The trial court "has a 'wide latitude' of discretion to restrict cross-examination and may impose reasonable limits on the introduction of such evidence. [Citation.]" (*People v. Smith* (2007) 40 Cal.4th 483, 513, quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.) The trial court also retains wide latitude within the confines of the confrontation clause, and no constitutional violation will be found in the restriction of cross-examination properly excluded under Evidence Code section 352. (*People v. Ayala* (2000) 23 Cal.4th 225, 301 (*Ayala*).)

Prior to Officer Carias's testimony, defense counsel informed the court that she intended to cross-examine him about his 2010 shooting of a PJ Watts gang member. A wrongful death action was brought against him and the LAPD and there was an LAPD directive barring Officer Carias from entering the Imperial Courts project. Counsel sought the evidence in order to show the officer's bias against PJ Watts gang members in general and to weaken his credibility as the investigator and as a gang expert.

The trial court heard the relevant testimony in an Evidence Code section 402 hearing outside the jury's presence. Officer Carias testified that he and his partner had been assigned exclusively to the PJ Watts gang for almost two years when, in October 2010, they were involved in a shooting in which a PJ Watts member was killed. The shooting had nothing to do with defendant or Martin. LAPD Internal Affairs conducted an investigation, as it routinely does when there is a shooting by an officer, found no wrongdoing and closed its investigation. The officers were initially placed on administrative duty and had no contact with the public during that time. The assignment was not punitive, but according to policy after a shooting. The officers were back on regular duty by July or August 2011 and still assigned to the gang unit. However, due to some community concerns, the Chief of Police issued a memorandum in August or September 2011 prohibiting Officer Carias and his partner from entering the Imperial Courts project unless another officer called for help. Officer Carias was able to

10

investigate this case by viewing the surveillance video and directing other officers to enter the projects when necessary.

The trial court considered the evidence and found that any probative value was outweighed by the potential for confusing the jury and causing an undue consumption of time. Thus, the trial court excluded the evidence, rejected defendant's requests to reconsider the ruling after Officer Carias testified and again prior to his rebuttal testimony, and denied defendant's motion for new trial on this basis.

Defendant does not dispute the trial court's finding that the 2010 shooting did not involve defendant, that there was no indication that Officer Carias knew of defendant prior to investigating this case, or that he targeted defendant for any reason other than his observations on the surveillance video. Instead, defendant contends that the officer's involvement in the shooting of a PJ Watts member and his status as a defendant in a wrongful death action could have affected his judgment and created a bias toward all members of the PJ Watts gang. Defendant argues that he was prevented from showing that the officer was motivated by bias, consciously or unconsciously, to conduct suggestive single person field show-ups, to exaggerate his efforts to find J Coll, and to opine that the crime was gang related simply because defendant was found in the projects and had gang tattoos. In addition, defendant suggests that the evidence was important to show that Officer Carias was unable to effectively investigate crimes or criminals within Imperial Courts due to his inability to physically enter the projects, placing both his PJ Watts gang expertise and his investigation in this case in question.

We first observe that the evidence would most certainly have implied that the shooting was not justified and that Officer Carias had wrongfully caused a death, thus reflecting poorly on his character. A trial court may properly exercise its discretion to preclude such collateral impeachment as inquiring into unrelated past conduct that does not bear on the witness's veracity or honesty. (*Ayala, supra*, 23 Cal.4th at p. 301.)

We also reject defendant's contention that the cross-examination would not have consumed an undue amount of time or caused jury confusion simply because defense counsel did not intend to bring out the details of the shooting. The prosecution would

11

have been required to rehabilitate Officer Carias by eliciting the details of the shooting, the investigation, and the reasoning behind barring Officer Carias from physically entering the projects. Defendant's argument that the officer's expertise was affected by his inability to investigate the gang or suspects from inside the projects might have required another gang expert to testify regarding effective investigative practices, and possibly evidence of similar investigations. Further, it is conceivable that defendant's suggestion of unconscious bias and its effect on identifying suspects could require expert testimony on that subject.

Moreover, the evidence was not highly probative. As the court observed, the "pending civil litigation of a shooting of a gang member unrelated to these two people . . . does not show a bias or a prejudice of this officer because virtually every . . . contact [requiring an officer] to fight, chase, [and] get shot at . . . would provide a bias or a prejudice. And we would not let all those in." And as respondent aptly points out, the broad discretion granted by Evidence Code section 352 "'empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' [Citation.]" (*Ayala, supra*, 23 Cal.4th at p. 301.)

Defendant has not shown that the trial court acted in an arbitrary, capricious or patently absurd manner; nor has defendant demonstrated a miscarriage of justice. A miscarriage of justice occurs when it appears reasonably probable that defendant would have achieved a more favorable result absent the alleged error. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.) The jury heard from Martin that Officer Carias had killed a PJ Watts member, and the jury heard a great deal of conflicting testimony from Martin. If defendant had been allowed to go into the collateral matter further the jury would also have learned that the LAPD had cleared Officer Carias of wrongdoing, that he was no longer on administrative duty, thereby leaving the jury with no indication that the prohibition against entering the projects had any purpose other than protecting Officer Carias. Under such circumstances we cannot agree that there was a reasonable probability that the jury's assessment of either witness would have been different.

There is no merit to defendant's argument that without the excluded evidence Officer Carias was unimpeachable as an expert witness. There is no indication that the trial court would not permit a challenge to Officer Carias's testimony regarding his gang expertise, experience, and education, if defendant had attempted to do so. Nor is there merit in defendant's assertion that Martin's credibility was left in doubt because Officer Carias was barred from investigating or searching for J Coll. Martin damaged his own credibility with conflicting testimony. Moreover, Officer Carias did in fact search for J Coll by researching LAPD resources, reviewing surveillance video, and having Detectives Moreno and Peters conduct the physical search in the projects.

We conclude that the trial court acted properly within its discretion in excluding cross-examination designated to elicit the unrelated shooting and the wrongful death civil action. As defendant has failed to demonstrate that an inquiry into such collateral matters "'would have produced "a significantly different impression of [the] credibility"'" of Officer Carias or Martin, the trial court's proper exercise of discretion under Evidence Code section 352 was not prejudicial and did not result in a violation of the Sixth Amendment. (*People v. Smith, supra*, 40 Cal.4th at p. 513, quoting *Delaware v. Van Arsdall, supra*, 475 U.S. at p. 680; see also *Ayala, supra*, 23 Cal.4th at p. 301.) We thus reject defendant's constitutional claims, as well.

## II. Substantial evidence of gang finding

Defendant contends that the jury's finding that the robbery was gang related was not supported by substantial evidence.

Section 186.22, subdivision (b)(1), authorizes a sentencing enhancement for felonies "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." The enhancement "applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 68 (*Albillar*).) "In sum, if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the

13

defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Id*. at p. 68.)

A gang enhancement finding is reviewed under the same substantial evidence standard as any other conviction. (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657.) Thus, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*Albillar, supra*, 51 Cal.4th at pp. 59-60.)

Defendant contends that there was insufficient evidence of association with a gang or benefit to a gang to support the first element of the enhancement: the felony was committed "for the benefit of, at the direction of, or in association with any criminal street gang." Defendant does not challenge the sufficiency of the evidence to establish that Martin was a member of the PJ Watts gang, and although he points out conflicting evidence, he accepts the jury's finding that he was also a member of the gang. Further, defendant does not challenge the sufficiency of the evidence to support the jury's finding that defendant committed the Villavicencio robbery with Martin.

Rather, defendant contends that "in association with any criminal street gang" must be construed as committing the felony in association with the gang as an entity, not just another gang member. On the contrary, the commission of a felony with a known gang member can give rise to a reasonable inference that the crime was committed in association with a gang, unless there is evidence that the defendant was engaged in "'frolic and detour unrelated to the gang. [Citation.]'" (*Albillar, supra*, 51 Cal.4th at pp. 61-62, quoting *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198; see also *Albillar* at

14

pp. 59-60 [rape by gang members acting in concert], 68.) Ample evidence supported the reasonable inference of the association element here. Defendant's accomplice was a documented and admitted member of the PJ Watts gang who had visible gang related tattoos which defendant undoubtedly recognized. Defendant also had PJ Watts gang related tattoos. Martin and defendant committed the crime in gang territory and Martin testified that his accomplice needed to go on a mission to prove himself, negating any suggestion of a frolic or detour.

Defendant also contends that the evidence of benefit to the gang is lacking because it came from expert testimony that was not supported by "specific evidence" that the Villavicencio robbery was committed to benefit the PJ Watts gang. Defendant relies primarily on the dissenting opinion of Justice Werdegar in *Albillar, supra*, 51 Cal.4th at pages 72-73, to support this contention. The majority held, however, that expert opinion can be sufficient to raise the inference that the conduct was committed for the benefit of the gang. (*Id*. at p. 63.) We are bound by the majority opinion of the Supreme Court. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Moreover, the majority has since made it clear that "'[e]xpert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement. [Citation.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)[2]

Officer Carias's testimony and opinion sufficiently raised the reasonable inference that the crime was committed for the benefit of a criminal street gang. The officer testified that the PJ Watts gang was a violent criminal street gang whose primary

---

[2]     We thus find the pre-*Albillar* and pre-*Vang* cases cited by defendant as illustrating the insufficiency of expert testimony to support gang allegations in the absence of direct testimony of the motive in the particular case, such as a public declaration of the gang's involvement or the exhibition of gang signs, colors, or tattoos, unhelpful. (See, e.g., *People v. Ramon* (2009) 175 Cal.App.4th 843, 851; *In re Frank S*. (2006) 141 Cal.App.4th 1192, 1199.) Nor do we find helpful defendant's comparison to *In re Daniel C*. (2011) 195 Cal.App.4th 1350, as the facts of that case were expressly distinguished from those in *Albillar* and are not analogous here. (See *Daniel C*., at p. 1361 [fellow gang members left store prior to shoplifting; no evidence of concerted action].)

15

activities were robberies, burglaries, home invasions, narcotics sales, shootings, and murder; and his testimony was supported by the certified dockets showing the firearm convictions of members of the gang. Officer Carias explained that gang members put in work for their gang by committing violent crimes, usually in their gang's territory and often in broad daylight. This activity benefitted the gang by building its violent reputation in the community through fear and intimidation, which discouraged citizens from coming forward, allowing the gang to continue to pursue its criminal enterprise without police interference.

Moreover, and contrary to defendant's assertion, there was additional evidence of gang benefit "specific" to the Villavicencio robbery. Although Martin claimed he committed the robbery for his personal benefit rather than that of the gang, he initially told police, "That's on PJ's." Also he testified that his accomplice was a new member and would thus have to prove himself by going on missions. It follows that defendant knowingly assisted his fellow gang member to benefit the gang by putting in work that would build the gang's violent reputation.

We conclude that Officer Carias's expert opinion and Martin's testimony sufficiently established that defendant and Martin came together as gang members to rob Villavicencio, and "thus, that they committed these crimes in association with the gang. [Citations.]" (*Albillar, supra*, 51 Cal.4th at p. 62.) We also conclude such evidence, along with Officer Caria's testimony regarding gang culture and his opinion that such a crime would benefit the gang by enhancing its reputation for violence, was sufficient to raise a reasonable inference that the robbery was committed to benefit the gang. From the same evidence, the jury could "fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members," thus satisfying both elements of the enhancement. (*Id.* at p. 68.)

## III. Ex post facto

Defendant contends that the imposition of a $280 restitution fine was unauthorized and violated the ex post facto clauses of the state and federal constitutions. He contends that the record shows that the trial court intended to impose the minimum fine, which was

16

$200 at the time of his offense, with a maximum of $10,000. (See former § 1202.4, subd. (b)(1); Stats. 2011, ch. 45, § 1, eff. July 1, 2011.)

Ex post facto laws are prohibited by both the California and United States Constitutions. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.) A prohibited ex post facto law is a statute that punishes as a crime an act which was not a crime when committed, or that inflicts greater punishment than permitted by the law applicable when the crime was committed. (*Collins v. Youngblood* (1990) 497 U.S. 37, 42-43; *People v. Acosta* (2009) 176 Cal.App.4th 472, 475.) "[T]he imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions. [Citations.]" (*People v. Souza* (2012) 54 Cal.4th 90, 143.)

Defendant contends that the trial court's intent to impose the minimum fine authorized by law can be found in the court's oral imposition of the fine, as follows: "You are to pay a $240 -- $280 restitution fine on count 1, a $280 parole revocation fine which is to be stayed unless you violate your parole . . . ." $240 was the minimum fine beginning January 1, 2012, before the minimum was raised to $280 beginning January 1, 2013. (Stats. 2011, ch. 358, § 1, eff. Jan. 1, 2012.) Defendant infers that from the correction from an amount equaling the 2012 minimum to an amount equaling the 2013 minimum that the court intended to impose the minimum, but erred as to which statute was in effect.

Respondent contends that defendant failed to preserve this contention with the appropriate objection in the trial court. We agree. Generally, in the interests of fairness and judicial economy, only "claims properly raised and preserved by the parties are reviewable on appeal. [Citations.]" (*People v. Scott* (1994) 9 Cal.4th 331, 354 (*Scott*).) "'It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.' [Citations.]" (*People v. Earp* (1999) 20 Cal.4th 826, 882.) The forfeiture rule reaches claims that a ruling violated constitutional rights, unless the claim of error was of the kind that required no action by the defendant to preserve it, or the defendant contends that

17

errors that were otherwise properly preserved for review had the additional legal consequence of violating the Constitution. (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.) Only unauthorized sentences fall into the first category, requiring no action to preserve the issue; discretionary sentencing choices require an objection. (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6; *Scott, supra*, 9 Cal.4th at p. 354.)

In general, a fine within the limits of the court's discretion under the prior statute is not unauthorized, even if it is erroneous. (*People v. Walz* (2008) 160 Cal.App.4th 1364, 1369.) Restitution fines are set at the discretion of the court, which may impose any amount between the minimum and maximum that is "commensurate with the seriousness of the offense." (§ 1202.4, subd. (b)(1).) Thus, as all the amendments to the statute raising the minimum fine maintained the maximum at $10,000, it was within the court's discretion to impose a $280 fine, and defendant's failure to object resulted in the forfeiture of the constitutional issue. (See *People v. Boyer, supra*, 38 Cal.4th at p. 441, fn. 17.)

Defendant requests that we exercise our discretion to reach the forfeited issue by either modifying the sentence or remanding for the trial court to clarify its imposition of the fine. We decline to do so. First, as respondent observes, the court may have deemed the new minimum to be the appropriate amount to impose in this case, and in general, we must presume that the trial court was aware of and followed the applicable law. (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114; Evid. Code, § 664.) In addition, the primary purpose of the ex post facto clause is "to prevent unforeseeable punishment." (*People v. Snook* (1997) 16 Cal.4th 1210, 1221.) As the foreseeable range of punishment was between $200 and $10,000 at the time the crime was committed, and defendant's fine fell within that foreseeable range, the primary purpose of the ex post facto clause was served. Finally, an important purpose of the forfeiture rule is to promote judicial economy by encouraging parties to bring easily corrected errors to the trial court in the first instance. (*People v. Smith* (2001) 24 Cal.4th 849, 852.) That purpose would not be served by a remand for a new sentencing hearing which could very well result in the same fine.

18

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.*
FERNS


_____
\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


19